# SUPREME JUDICIAL COURT

#### FOR THE

## COUNTY OF ESSEX, NOVEMBER TERM 1848, AT SALEM.

PRESENT.

Hon. LEMUEL SHAW, Chief Justice.
Hon. SAMUEL S. WILDE, ⎫
Hon. THERON METCALF, ⎬ Justices.
Hon. RICHARD FLETCHER, ⎭

ALBERT H. NELSON, District Attorney, *vs.* CALEB CUSHING & others and THE TRUSTEES OF THE PUTNAM FREE SCHOOL.

O. P., by his last will, bequeathed the residue of his estate, to accumulate in the hands of his executors until it should amount to the sum of $50,000, and then to be paid over by them, for the establishment and support of a free English school in the town of N., to a board of trustees to be appointed by the selectmen of N., who, besides appointing the trustees, were "always and at all times to have and exercise the right of visitation, for the purpose of looking to the security of the funds, and that the interest or income of them is applied according to the bequest:" The will also provided, that vacancies in the board of trustees, after the first appointment, should be filled by nomination from the board, subject to the approval of the selectmen; that in the selection of trustees, no reference should be had to their places of residence, but only to their qualifications for the trust; that the trustees should invest the whole principal in good and sufficient securities, bearing interest or producing income, to the satisfaction of the select-

Nelson, District Attorney, *v.* Cushing & others.

men; and that such principal should remain a permanent fund, the interest **or** income only of which should be applied to the establishment and support of **the** school: The purposes of the bequest were declared by the testator to be, "for the establishment and support of a free English school in N. for the instruction of youth wherever they may belong; the youth to be instructed in reading, writing, and arithmetic, and particularly in the English language, and in those branches of knowledge, necessary to the correct management of the ordinary affairs of life, whether public or private, but not in the dead languages:" When the residue thus bequeathed had accumulated to the sum of $50,000, the selectmen of N. appointed a board of trustees to whom the same was paid over by the executors, and the trustees were subsequently incorporated by an act of the legislature, with the usual powers and duties of corporations, and with liberty to hold real and personal estate, the net yearly income of which should not exceed $6000, to be applied exclusively to the purposes of education, in conformity with the provisions of the will of O. P: The trustees, in the execution of their duties, proceeded to erect a building suitable and adapted for the instruction of pupils of both sexes, and announced their determination and intention to establish therein, and to appropriate the income of the fund to support, a school for the instruction of such pupils: The inhabitants of N., thereupon, at a lawful town meeting, appointed a committee to confer with the trustees on the subject, with "authority to institute amicable proceedings, if necessary, before the S. J. C. for the purpose of determining whether the fund could be applied to the erection and support of a school for both sexes, or for the male sex only:" The trustees declined proceeding in the manner proposed, and the committee, by three of their members, caused the district attorney to file an information in the nature of a bill in equity in the S. J. C. against the trustees, praying the court to declare, that, according to the true intent and meaning of the testator, the fund was to be appropriated to the establishment and support of a school for boys only; and to restrain the trustees from applying the income of the same, or any part thereof, to the support of a school for girls: It was held: —

1. That the act of incorporation did not vary the powers or duties of the trustees, or change the character of the school.

2. That the trustees constituted an eleemosynary corporation, founded by the testator, or donor, for the purposes of education; which was in its nature the establishment of a charity, looking forward to perpetual existence.

3. That the selectmen, in their character of visitors, were not the agents, and did not act directly upon the interests, of the town; that they were not accountable to the town for their acts as such visitors; and that, in the exercise of their visitatorial powers, they could not be directed, controlled, limited or restrained by the town.

4. That when a general visitatorial power is provided by the founder of an eleemosynary corporation and foundation for charity, no court either of law or equity will interfere to control or direct the ordinary exercise of such power; except when the visitors, as such, act contrary to law in a matter amounting in effect to a breach of trust.

5. That, by the terms of the will, the selectmen had a general visitatorial power, as to the charity in question, extending to all cases not amounting in law to a breach of trust, and that their decisions within the scope of their authority were final.

6. That the selectmen being constituted by the founder a tribunal to superintend the doings of the trustees, to correct their mistakes, and to restrain all abuses of authority by them, it was for the selectmen, in the first instance to decide whether any act complained of as an error or mistake were such or not.

Nelson, District Attorney, *v.* Cushing & others.

7. That the trustees and visitors of a charitable institution, each in their own sphere, constitute the regular government of such institution ; and, until they have acted finally, and in a manner contrary to law, and in violation of their trust, in reference to a particular matter, there is no ground for the interference of a court of equity.

8. That as the selectmen, in the present case, had not acted, in their visitatorial capacity, upon the alleged violation of their duty by the trustees, the bill could not be maintained.

9. That the description in the will, of the objects of the testator's bounty, was broad enough to embrace children and youth of both sexes, and did not limit the school to the instruction of either to the exclusion of the other ; and, therefore, that if the visitors had acted and concurred with the trustees, in their construction of the will, in this respect, there would have been no breach of trust or violation of duty, on the part of the latter.

THIS was an information in the nature of a bill in equity, filed *ex officio* in this court by Albert H. Nelson, esquire, attorney of the commonwealth for the northern district, pursuant to the statute of 1847, *c.* 263,* by and at the relation of George Lunt and others, against Caleb Cushing and others, for the purpose of enforcing the performance, and preventing a misappropriation of the funds, of a charity created by and under the will of Oliver Putnam, deceased, for the establishment of a free school in Newburyport. Answers were filed by the respondents, both in their individual capacities, as trustees, and as a corporate body established by an act of the legislature, under the name of the Trustees of the Putnam Free School.

From the bill and answers, upon which the cause was heard, it appeared that Oliver Putnam, formerly of Newburyport, and afterwards of Boston, where he died in 1826, left a will, in which, after the appointment of executors, and providing for certain specific devises and bequests, he disposed of the residue of his estate in the following terms : —

" The residue of my property I give and bequeath for the

---

* The first section of this act provides as follows: " The district attorneys of this commonwealth shall see that all funds, given or appropriated to public charities, within their several districts, are duly applied to their respective objects ; and they are hereby authorized and required to use all lawful process to prevent the misapplication thereof, and to employ all lawful remedies for the correction of abuses and breaches of trust in the administration of the same."

44*

establishment and support of a free English school in Newburyport, for the instruction of youth wherever they may belong ; if at the final payment of the foregoing legacies, it should amount to fifty thousand dollars, the executors will then pay it over as hereafter provided; but if not, they will retain it to accumulate until it amounts to that sum, and then pay it over to trustees for that purpose to be appointed by the selectmen of Newburyport; after the first appointment of trustees, vacancies in their board to be filled by nominations from them, subject to the approval of the said selectmen, who, besides, are always, and at all times, to have and exercise the right of visitation, for the purpose of looking to the security of the funds, and that the interest or income of them is applied according to the bequest. In the selection of trustees, no reference is to be had to their places of residence, but only to their qualifications for the trust. The trustees are to invest the whole principal in good and sufficient securities bearing interest or producing income, to the satisfaction of the said selectmen; to be and remain a permanent fund, the interest or income only of which to be applied to the establishment and support of the school ; the youth to be instructed in reading, writing and arithmetic, and particularly in the English language, and in those branches of knowledge necessary to the correct management of the ordinary affairs of life, whether public or private, but not in the dead languages ; the monitorial system of instruction to be introduced and used so far as it may be found, on experience, that it can be done with advantage."

The residue thus bequeathed, not amounting to the requisite sum, at the time of the testator's decease, was retained and managed by the executors until the beginning of the year 1838, when, the funds having accumulated so as to amount to the sum of $50,000, the selectmen of Newburyport appointed a board of trustees to receive and manage the same, being the respondents in this cause, to whom, on or about the 1st of March, 1838, the executors paid over the funds in their hands.

On the 9th of April, 1838, the trustees and their successors, by an act of the legislature, (*St.* 1838, *c.* 85,) were made a corporation, by the name of the Trustees of the Putnam Free School, to be established in the town of Newburyport, with the usual powers and privileges of corporations, and with liberty to hold and manage real and personal estate, the net income of which should not exceed six thousand dollars, to be applied exclusively to the purposes of education, in conformity with the provisions of the will of Oliver Putnam, deceased. The act provided, that the treasurer of the trustees should give bond, to their satisfaction, for the security of all moneys, papers, and funds belonging to the trust, which might come into his hands, as well as for the faithful discharge of the duties of his office. The third section was as follows: " The said trustees may remove any member of their board, when disqualified, by age or otherwise, to discharge the duties of his said office, by vote of two thirds of the other members, and, by a similar vote, shall fill any vacancy in their board, under the limitation and in the manner provided in the will of the said Putnam."

The trustees, in the execution of their duty, as such, proceeded to erect a building, under the name of the " Putnam Free School ; " and, as the relators alleged, " caused the same to be so erected and constructed, by means of various and separate apartments, as to admit and accommodate pupils of both sexes." The relators alleged, further, and the respondents admitted in their answer, that the respondents had determined, and publicly announced their intention, to occupy the house so erected, and to fill up the same, with pupils of both sexes; to establish a school therein for such pupils ; and to appropriate the income and interest of the trust fund in their hands to the support thereof. The relators alleged, that this was a violation of the trust, inasmuch as the testator intended that his estate should be applied to the establishment and support of a free English school, for the instruction of boys only and not of girls.

In the early part of the year 1845, the town of Newbury-

port voted that the relators and others "be a committee to confer with the trustees of the Putnam fund, and be authorized to institute amicable proceedings, if necessary, before the supreme judicial court, for the purpose of determining whether the Putnam fund can be applied to the erection and support of a school for both sexes, or for the male sex only." The committee communicated this vote to the trustees, on the 10th of April, 1845, and requested them to fix as early a time as convenient for the purposes of the conference. The trustees, however, on the 26th of April, returned an answer to the committee, that, in their opinion, it was inexpedient for them to enter by agreement into the proceedings proposed by the committee.

The trustees thus declining to proceed in the manner requested by the town, the committee, by three of their number, caused this information and bill to be filed by the district attorney, on the 6th of July, 1847. The prayer of the bill was, that the court should declare that the fund was to be appropriated and applied to the establishment and support of a free English school, for boys only, and that the respondents might be restrained from applying or appropriating any part of the income thereof to the instruction of girls.

The respondents, in their answers, which were filed on the 11th of September, 1847, admitted that they had applied a part of the income of the fund to the erection of a school-house in Newburyport, and had made arrangements to have a free English school kept therein for the instruction of youth wherever they might belong; and that it was their purpose to admit both boys and girls to the school, believing that they were bound to do so by the provisions of the will; but that if they were not compellable, they had, in their discretion, subject to the visitatorial power of the selectmen of Newburyport, the right so to do; and they averred that they had been confirmed in this opinion by the advice of learned and eminent counsel, and by the long continued and settled usage in this commonwealth; and they annexed to their

answer a schedule containing the names of a large number of incorporated academies, with a reference to the different private acts incorporating the same, in which, as the respondents alleged, the word "youth" had uniformly been construed to include children of both sexes.

The respondents also admitted, that they had received the letter of the committee, communicating a copy of the vote of the town above mentioned, and that they had declined acceding to the conference and arrangement therein proposed; and they stated their reasons for so declining, namely, that the selectmen of the town of Newburyport were the visitors of the charity; that the inhabitants of the town, either organized or unorganized, had no visitatorial power or right; that the respondents considered that it would be a breach of duty to account for their proceedings to those to whom the founder had given no right or power; that they were advised by eminent counsel, and themselves verily believed, that the meaning of the testator was plain; and, therefore, that they had no right voluntarily to incur the expense of a suit to obtain an opinion of this court thereon.

In conclusion, the respondents averred, that the selectmen of Newburyport were the visitors of the charity, and that they alone were authorized by the testator, to see to the proper application of the trust fund; that the respondents had done nothing contrary to the requirements of the visitors, and that they had endeavored in perfect good faith to discharge their duty as trustees; and they thereupon submitted themselves to such orders and decrees, if any, as the court might think lawful and meet in the premises.

The case was argued and decided at the November term, 1847.

*G. Lunt*, for the relators.

*B. R. Curtis*, for the respondents.

SHAW, C. J. This is an information, in the nature of a bill in equity, filed by the district attorney and public prosecutor for the district including the county of Essex, at the relation of certain inhabitants of Newburyport, against Caleb

Cushing and others, as the Trustees of the Putnam Free School, in that town.

It appears, that Oliver Putnam, late of Boston, formerly of Newburyport, by his will, left the residue of his property, after the payment of specific legacies, and when the same should have accumulated to the sum of fifty thousand dollars, for the establishment and support of a free English school in the town of Newburyport, for the instruction of youth wherever they might belong. He directs his executors to pay the money into the hands of trustees, to be appointed by the selectmen of Newburyport. After the first appointment, vacancies in the board are to be filled by nomination from the trustees themselves, subject to the approval of the selectmen, who, besides, are always and at all times to have and exercise the right of visitation, for the purpose of looking to the security of the funds, and of seeing that the interest and income thereof is applied according to the bequest. In the selection of trustees, no reference is to be had to their places of residence, but only to their qualifications for the trust. After directions in regard to the investment of the permanent fund, he specifies somewhat more precisely the nature of the school, to which the income is to be appropriated, by directing that it shall be applied to the establishment and support of the school; the youth to be instructed in reading, writing and arithmetic, and particularly in the English language, and in those branches of knowledge necessary to the correct management of the ordinary affairs of life, whether public or private, but not in the dead languages.

It appears that in 1826 the testator died and his will was duly proved, and that in 1838, the executors, being prepared to pay over the $50,000, according to the will, gave notice thereof to the selectmen of Newburyport, who thereupon appointed Caleb Cushing and six others, the respondents, to be trustees pursuant to the will.

After the money was paid over, a special act of the legislature (*St.* 1838, *c.* 85,) was passed, reciting the gift and the purpose of it, and incorporating the trustees; who, with their

successors, were made a corporation, by the name of the Trustees of the Putnam Free School, with all the powers and privileges and subject to the restrictions contained in the forty-fourth chapter of the revised statutes, with liberty to hold real and personal estate, producing a net income not exceeding $6000 a year, to be applied exclusively to the purposes of education, in conformity with the will of Oliver Putnam, the donor. The second section requires the treasurer of the trustees to give bonds. The third section authorizes the board to remove a member, by a vote of two thirds of the other members; and, by a similar vote, they are authorized to fill any vacancy in their board, under the limitation and in the manner prescribed in the will.

This act, in our judgment, does not vary the powers or the duties of the trustees, or change the character of the school placed under their management. It enables them to act in a corporate name, and to have a corporate seal; and it affords them the facility of taking conveyances, obligations and securities, in their corporate name, and avoids the necessity of changing such securities upon a change of individual members composing the board. Vacancies are to be filled, as before, by nomination from the board, subject to the approval of the selectmen. Whether the last section of the act requires a nomination to be made by a vote of two thirds, and whether that is in conformity with the will, may be open to some question; though not important to the present inquiry. If such a restriction would be contrary to the true construction of the will, perhaps the last part of the section, requiring the vote nominating a successor to be passed under the limitation and in the manner provided by the will, would be held to remove the doubt as to the construction of the act, so as to make it conform to the true construction of the will.

It further appears that this act was accepted, and that the trustees, having received the funds, proceeded to erect a building in Newburyport, and to establish the school.

The gravamen of the complaint set forth in the bill is, that the trustees have proceeded to erect a structure for a school-

house, which is adapted to the instruction of children and youth of both sexes; that they intend to receive and admit to the benefits of the school girls as well as boys; that this is contrary to the will of the testator, which, under the term "youth," was intended to establish a school for boys only; that the proceeding of the trustees is a violation of trust, and contrary to their duty; and the bill prays that they may be restrained by an injunction from thus perverting and misapplying the funds committed to their trust.

Answers have been filed, both by the individual trustees, or most of them jointly, and also by the corporation, admitting all the material facts. But the respondents insist, that, according to the construction which they put upon the will, they understand that it was the intention of the testator to establish a school open to pupils of both sexes, if the trustees should think fit to admit them; that nothing in the will limits the benefits of education at this school to male pupils only; and, therefore, that it is not a breach of trust, or a violation of their duty, to admit females. This is the question intended to be raised by the bill and information. The cause has been very ably argued on both sides, and the very full and ingenious argument in support of the prosecution, for the purpose of illustrating the meaning of the term "youth," by extensive citations of passages from the English translations of the Scriptures, and the best poets and classical writers of England, as well as the philologists, has given the discussion an air of literary interest, which questions of law, in ordinary forensic debate, will seldom admit.

A preliminary question, however, of a purely legal character, precedes the question, which has thus been discussed in a manner alike interesting for its literary taste and research, and for its legal discrimination; and that is, whether in this stage of the proceedings, the complaint is not prematurely brought, and whether this court, as a court of equity, has jurisdiction of it. It becomes necessary, therefore, to consider what is the nature of the institution, respecting which the question arises, and the established rules of law applicable to it.

We have already said, that, in our judgment, the act of incorporation referred to did not constitute this charity. It did not enlarge or diminish the powers of the trustees, except as to the mode of acting in certain particulars, and it did not exempt them from the duties and responsibilities, which would have devolved upon them as trustees acting in their natural capacities.

The trustees, then, are an eleemosynary corporation, founded by the testator, as donor, for the purposes of education, which is in its nature a charity, and looks forward to perpetual existence. There is a further provision in the will, confirmed by the act of incorporation, making the selectmen of Newburyport a board of visitors. They were probably selected, because they or some corresponding body of municipal officers would have perpetual succession; because they would be likely to be conversant with the wants and condition of the town; and would have a sufficiently favorable regard to the best interests of its inhabitants. And yet it is manifest, that this school was in no sense intended by the founder to be a town school. This is sedulously guarded against, by a provision in the will, that the trustees having the immediate direction of the school need not necessarily be residents of Newburyport, and that the school should be for the instruction of " youth " wherever they might belong. The donor probably considered that he had sufficiently indicated his partiality for Newburyport, by providing that the school should be established there, and that the superintendence of it should be confided to the selectmen of that town, by giving them a visitatorial power. Still it is not a town school. The selectmen, in the powers to be exercised by them, are not the agents of the town; nor are they acting directly upon the interests of the town, or accountable to the town; and they cannot therefore be directed, controlled, limited or restrained, in the exercise of their powers, by the act of the town. They exercise a special authority, created by the will of the testator, and confirmed by the act of incorporation.

The founder of a charitable institution has a right, in the

first instance, by such orders and statutes as he may then make, or as he reserves the power to make, and afterwards in fact makes, within the limits of such reserved power, to direct how and in what mode his charity shall be administered; and, by the visitatorial power, which he may retain to himself or his heirs, or delegate to other persons or bodies, to see that his will and purpose in creating the charity shall be observed and carried into effect, and to restrain mismanagement and correct abuses. *Philips* v. *Bury*, by lord Holt, 2 T. R. 346, 352; *Attorney-General* v. *Clarendon*, 17 Ves. 491. And this doctrine is fully confirmed and illustrated by the American decisions, including those of Massachusetts. *Attorney-General* v. *Utica Ins. Co.* 2 Johns. C. 371, 384; *Dartmouth College* v. *Woodward*, 4 Wheat. 518; *Murdock, Appellant*, 7 Pick. 303. These authorities, which might be greatly multiplied, go to the point, that when a general visitatorial power is provided by the founder of an eleemosynary corporation and foundation for charity, no court of either law or equity will interfere to control or direct the ordinary exercise of such visitatorial power, subject to the limitation only, that when the visitors, in the exercise of their power, act contrary to law in a matter amounting in effect to a breach of trust, then a court of equity, under their ordinary jurisdiction, will interpose, upon the application of the attorney-general, as the representative of the public, to prevent and restrain such breach of trust, and even, if need be, to remove a trustee and substitute another.

In the present case, the visitatorial power is vested in the selectmen in the following manner. After directing that vacancies in the board of trustees shall be filled by nomination from themselves, subject to the approval of the selectmen, the testator adds: " who, besides, are always and at all times to have and exercise the right of visitation for the purpose of looking to the security of the funds, and that the interest or income of them be applied according to the bequest." We think that this language, taken in connection with the whole will, gives a general visitatorial power; and

such a power gives a general superintendence, unless it be limited in terms, or divided amongst two or more persons or bodies. Here there are no express words of limitation, and no visitatorial powers reserved; the words expressing the purposes of the testator are affirmative and not negative; and, besides, these purposes are the seeing to the safety of the principal and to the application of the income of the fund according to the bequest; which purposes do, in brief terms, embrace the two great objects of the donor, and give a general superintendence. Such a visitatorial power extends to all cases not amounting in law to a breach of trust; and the decisions of the visitors, within the scope of their authority, are final. See *Dartmouth College* v. *Woodward*, 4 Wheat. 518, opinion of Story, J., on page C76, and cases cited by him. This visitatorial power must extend to all cases, where, by the will, the trustees are in the first instance to exercise their judgment and discretion, and select amongst various things authorized by the will. If, for instance, under this will, the trustees, with the assent of the visitors, should determine to invest their funds in a hazardous or unproductive species of' stock, and should the friends of the institution, through the district attorney, apply to this court to restrain the trustees, we think the answer must be, that the trustees are acting within the scope of their authority, and that their judgment cannot be controlled. Should the trustees attempt to invest their funds in an illegal enterprise, the result would be different. As the will does not limit the pupils to those residing in Newburyport, or even in Massachusetts or America, and as the school can accommodate but a limited number, the trustees, subject to the approval of the visitors, must make a selection, and, of course, must exclude many applicants. But as, in making such exclusion, they will be acting within the limits prescribed by the donor, their proceedings cannot be complained of as illegal.

Such being the authority and power of a board of visitors, —a domestic tribunal, constituted by the founder of the charity, under the authority of law, to superintend the doings of

the trustees, to correct mistakes, and to restrain all abuses of authority, — they are to decide, in the first instance, whether any act complained of as an error or mistake be such or not. The first objection to the maintenance of this bill by the public prosecutor is, that the visitors have not acted upon this subject. If, indeed, the visitors, upon a suitable applica tion, had refused to act upon the question, or to decide either way, then indeed a mandamus might issue from the other side of the court, to require them to do so. *The King* v. *St. John's College*, 4 Mod. 260, 368 ; *The King* v. *Bishop of Worcester*, 4 M. & S. 415. But until they have decided, the presumption is that they will decide right, and that, if the trustees have fallen into an error in their construction of the will, the visitors will correct it. This is the very purpose for which they are placed in that responsible situation by the donor. The trustees and the visitors taken together, each acting in their own sphere, constitute the regular government of the charitable institution ; and, until they have finally acted, and acted contrary to law and in violation of their trust, no such breach can be held to exist. But the powers of this court, under its general jurisdiction in equity over trusts, when properly applied to, may be invoked to prevent or redress a breach of trust, arising from a misapplication of funds placed in trust for charitable purposes. If the relators and the public prosecutor were right, therefore, in their con- struction of the will, and the true construction thereof were, that the school intended to be established was a school exclu- sively designed for boys and young men, we should be of opinion, upon the preliminary question above stated, that this bill could not be maintained. But as the other question has been put in issue by the pleadings, and has been fully argued, we propose to give an opinion upon it. The question is, what the testator intended, when he provided for a school for the instruction of youth ; and this intention must be inferred from the sense of the words used, construed with reference to the subject matter and the other parts of the will.

Not much light on this subject can be obtained from

dictionaries; their definitions are necessarily very concise, and do not admit of such copious descriptions and illustrations, as to mark the minute shades of difference in the meaning of the same word. The term "youth" often means young men; and when used with the indefinite article, "a youth," that is its proper meaning. In many of the passages cited, it appears by the connection or context, and by the terms with which the word is associated or contrasted, that the term "youth" means "young man." But, used by an inhabitant of Massachusetts, in reference to the establishment of a free school, (not a college or academy,) for the purpose of affording general instruction, as an English school, the court are of opinion, that the word "youth" includes youth of both sexes. This is the sense in which we understand it; in which we think it is generally understood by educated men; a sense, not derived from any one source or authority, or course of reasoning, but, as all our knowledge of the sense of vernacular language is derived, from good usage.

This conclusion, however, we think, is strengthened and confirmed by several considerations. The first is the use of the term "youth" in legislative enactments. The earliest general act on the subject of schools, after the adoption of the constitution, the statute of 1789, *c.* 19, is entitled "an act to provide for the instruction of youth, and for the promotion of good education." According to the terms of this statute, female children, unless embraced under the general term "youth," both in the title and in various provisions of the body of the act, would be excluded. And yet there can be no doubt, from the general tenor of the act, and from the construction practically put upon it, that it included instruction for children and youth of both sexes. The preamble recites that part of the constitution, which makes it the duty of the general court to provide for the education of youth, &c. The words "children and youth" are frequently used in connection. The word "children" includes persons of both sexes, and "youth" differs from it only by referring to and

**45\***

embracing young persons of somewhat more advanced age and proficiency, and would seem intended therefore to include, as the word "children" does, persons of both sexes. The fourth section makes it the duty of all instructors of youth, to impress on the minds of the children and youth, committed to their care, &c. Another part of the same section makes it the duty of such instructors to lead those under their care (as their ages and capacities will admit) into a particular understanding of the tendency of the before mentioned virtues, &c. Here it is manifest, that the phrase "all others under their care," that is, all pupils of schools, is used synonymously with "children and youth," and therefore must include girls as well as boys, unless girls were to be excluded altogether from public schools. The seventh section makes it the duty of ministers and others to use their influence that the "youth" of their respective towns do regularly attend the schools thus appointed and supported for their instruction. Here the term "youth" is used alone, and includes all pupils who are to attend the public schools; and the latter designation, by the usual sense of the community, includes both sexes.

The same observations may be made on the statute of 1826, *c.* 143, which is entitled "an act providing for the instruction of youth." Similar provisions with those contained in the act of 1789, are embraced in this act. Between these acts, the several statutes of 1799, *c.* 66, 1802, *c.* 11, and 1823, *c.* 111, were passed, on the general subject of common schools; in most of which, the term "youth" is used in their titles and provisions to designate all pupils of the common schools. This subject was therefore constantly before the public, during the greater part of the testator's mature life, and very nearly to the time of making his will; and, during all this time, the subject of common schools was discussed, as embracing measures providing for the instruction of youth, under which term young persons of both sexes were included. This view, derived from the legislation of the commonwealth, is confirmed by the provisions of the twenty-third chapter of the revised statutes, the seventh and eighth sections of

which are almost repetitions of the language used in former acts.

We are of opinion, that no argument can be justly drawn from other parts of the will, leading to a contrary conclusion. The school is to be an English school ; instruction in the dead languages is excluded in terms ; and yet instruction in those languages, which are usually designed to fit persons for college, is the peculiar characteristic of a school for boys. In the language of the will, the school is " to afford instruction in those branches of knowledge, necessary to the correct management of the ordinary affairs of life, whether public or private." By the latter clause, we understand affairs, public as well as private, or both public and private. . The school embraces instruction which is useful and necessary to girls as well as to boys, to enable them to perform their appropriate duties in the affairs of life. This description is large enough to embrace a school for the instruction of children and youth of both sexes, and does not limit the school to the instruction of either, to the exclusion of the other.

The court are therefore of the opinion, that if the visitors had concurred with the trustees, in their views of the construction of this will and of their power under it, to admit female as well as male pupils to the benefits of instruction at the Putnam Free School, and had admitted them accordingly, it would not have been a violation of their duty, or any breach of the trust reposed in them by the will of the testator.

*Bill dismissed.*